# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| ANTONIO B. MUSSO, | ) | |
| | ) | **No. 13 C 2036** |
| Plaintiff, | ) | |
| | ) | **Magistrate Judge Arlander Keys** |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Antonio Musso's motion for summary judgment. Mr. Musso seeks a remand or reversal of the Commissioner's decision to deny his application for Disability Insurance Benefits and Supplemental Security Income. The Commissioner seeks summary judgment affirming the decision to deny benefits. For the reasons set forth below, Mr. Musso's motion [21] is denied and the case is affirmed.

## BACKGROUND

Mr. Musso previously applied for disability benefits and was denied after a hearing before Administrative Law Judge (ALJ) Denise Martin on March 12, 2010.[1] On April 27, 2010, Mr. Musso

---

[1] Mr. Musso previously filed a disability application in 2007, claiming disability since June 2008 (R. 115, 117-19). Following administrative hearings in 2009 and 2010 (R. 71-122), Plaintiff's prior claim was denied by an ALJ on March 12, 2010, and upheld by the Appeals Council on May 6, 2011 (R. 12). *See* 20 C.F.R. § 404.955. The ALJ in Plaintiff's present claim explained that the prior denials were *res judicata* regarding Plaintiff's current claim for the period prior to March 13, 2010, and that

applied a second time for disability benefits under Title II and Title XVI of the Social Security Act, alleging that he became disabled as of July 8, 2008 due to a seizure disorder, left and right broken femurs, and head trauma. (R.227, 234).

The Social Security Administration denied his second application initially and on reconsideration. (R.142). Thereafter, Mr. Musso requested a hearing before an ALJ, and the case was assigned to ALJ Patricia Supergan, who held a hearing on Mr. Musso's case on September 28, 2011 in Chicago. (R.37-70). At the hearing, Mr. Musso appeared and was represented by counsel.

I. Plaintiff's Hearing Testimony

At the March 12, 2010 hearing, Mr. Musso testified to the following[2]: He was born on July 16, 1969, he is 5'11", and around 160 pounds. (R.74). He is single and lives with his parents, Concetta Musso and Masario Musso, and his 18 year old nephew, Nicky. (R.74-75). He completed the twelfth grade and is not currently working. (R.75). The last time he was employed was at Tony's Fire Foods for about two weeks in June of 2009. (R.75-76). His last long-term job was at Home Depot, where for approximately three years he worked part-time stocking supplies

---

nothing in her decision re-opened or disturbed the prior ALJ's decision (R. 12). Therefore, Plaintiff's prior application is not before this Court for judicial review. *See Califano v. Sanders,* 430 U.S. 99, 108 (1977).

[2] This prior hearing information is included merely to provide the background personal information on Mr. Musso.

and assisting customers. (R.76-77). Home Depot tried to work with him, as a "couple months would pass and I'd have a seizure, then go a few months…have [another] seizure." (R.77).  Over the past 15 years, he has worked for Cintas clothing (one month); Family Craft Builders (one month before he had an accident); Synergy Service Merchandise (one month until seizure); Fed Ex ("wasn't there long"). (R.77-78).

He feels unable to continue working due to his continuous seizures that have taken a toll on his body, both physically and mentally.  His cognitive functioning is impaired and he is unable to multi-task on the job. (R.79). Until he began taking Keppra in September of 2007, he regularly had about two seizures every four to five months. *Id.*  He now has seizures less frequently, over the past six months he had two, but he also forgot to take his medication. (R.80).

At the second hearing on September 28, 2011, Mr. Musso testified to the following:  his last seizure occurred in September. (R.44). He felt it coming a little bit, then it came on real quick, the rest is a blank. *Id.*  He remembers waking up and realizing something happened, but does not remember his parents bringing him upstairs to the couch. (R.51).  He had no energy and just sat in front of the TV for two hours trying to recuperate, until he forced himself to get up to take a shower. *Id.*  He then relapsed and had a second seizure (R.52).  He

bruised the area under his eye brows when he had the seizure and fell (R.50). He currently has bruising on his body from previous seizures. (R.52). He had a concussion and went to the doctor for it in 2009. *Id.* He got into an automobile accident and broke his left femur. (R.53). He had to have his leg pinned, which creates pain when he sits. *Id.* He has to get up and walk off the pain; he cannot sit longer than half an hour without pain. *Id.*

He does not always have a total episode, sometimes he is able to control the outcome. (R.57). His last seizure occurred in February, but he was able to "fight it off." *Id.* He felt something coming on; his knees started to buckle, but he was able to stop it. *Id.* He took one Dilantin and after 15 minutes, he was able to walk normal. When the ALJ stated that his brother claimed in a letter that Mr. Musso will sometimes just drift off while he is having a conversation with him, he confirmed that he will easily lose attention. He said it is more of a timing thing, where he is delayed and is not able to process and respond right after he hears something. (R.58). In a work setting, other people might find this problematic. (R.58-59). He fears letting people see this side of him, as well as having an episode in front of others. (R.60-61).

With regard to his daily life, he takes out the garbage and cleans some dishes (R.45). He has a Facebook account he uses

occasionally, and he looks up information on the lap top he shares with his nieces. *Id.* He does not play the computer or video games, but he occasionally reads magazines. His parents cook (R.47). Sometimes he does the laundry, but usually it is his mother. He has a couple friends he talks to on his cell phone. He goes out walking by himself to nearby places including 7-Eleven and Walgreens when he gets hungry. (R.53). He quit smoking roughly two years ago and has not had any alcohol since that time either. (R.46).

As to his physical issues, his left hip hurts when he sits and he has to walk off the pain. Walking is not that difficult, but he does need to sit down frequently. (R.53). When he had his concussion, he injured his neck as well. (R.54). He has had seizures at work. He kept working until he was no longer feeling well. He did not have the motivation and was depressed (R.55). He has seizures when he forgets his medication, or does something that has an adverse reaction to the medication, such as drinking alcohol (R.55-56).

## II. Vocational Expert

A vocational expert ("VE"), Grace Gianforte, testified at the hearing on September 28, 2011. (R.63). The VE testified that she had not discussed the case with the plaintiff, that her testimony was consistent with the Dictionary of Occupational

Titles, and that the job descriptions were consistent with the national economy.  (R.63-64). The VE testified to hearing the relevant testimony, reviewing the exhibits and consulting the U.S. Bureau of Labor and Statistics.  (R.64).

The VE testified that Mr. Musso "worked in retail sales, like department stores, grocery stores, DOT code 290.477-014, light, SVP: 3, semi-skilled." *Id.*  She also testified that he worked as a "sales attendant at a home improvement store, associated with building materials, DOT code 299.677-014, SVP: 3, semi-skilled and heavy in exertion.  There's been some temporary work with a staffing agency." *Id.*  Additionally, the VE testified that Mr. Musso's exhibits showed "there was construction laborer, ding cleanup for three months in '00, 2000, DOT code 869.687-026, SVP: 2, unskilled and heavy in exertion." (R.65).

During the testimony, the ALJ asked the VE to hypothetically assume an individual of Mr. Musso's age, education and work experience, however, the individual had no exertional limitations, except that he is unable to climb ladders, ropes, or scaffolds and would need to avoid concentrated exposure to hazards such as moving machinery or unprotected heights.  The ALJ then asked the VE would such an individual be able to perform any of Mr. Musso's past relevant work, to which the VE responded that the cleaner/packer and

general retail sales jobs are still viable, but the construction laborer and sales attendant at Home Depot job would be eliminated, as he would have to climb ladders. (R.65).

The ALJ then altered the hypothetical slightly by asking the VE to now assume that the same individual had the residual functional capacity to perform light work, except that he should not stand or walk for more than two to four hours in an eight-hour workday; the individual would be unable to climb ladders, ropes or scaffolds and occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he would need to avoid extreme temperatures, and hazards; avoid driving motor vehicles, and the individual could further perform unskilled work tasks that could be learned in 30 days or by a demonstration. The VE responded that this individual would not be able to perform any of Mr. Musso's past relevant work. (R.65-66).

However, the VE testified that at the light level of exertion with sedentary work, where the individual can stand for up to two to four hours and can walk or sit the rest of the time, there is the occupation of office helper, DOT code 239.567-010, SVP: 2, with about 30,000 positions in this region of the economy. (R.66). Additionally, the VE testified that there would be sedentary work as an order clerk, in the food and beverage industry, 209.567-014, SVP:2 (2,000 jobs in the

region/3000,000 nationally); and the occupation of addresser, 209.587-010, SVP: 2 (1,200 jobs in this region/12,000 nationally). *Id*.

The ALJ then asked if the VE were to further limit this individual to unskilled work tasks that would involve occasional decision-making, occasional changes in the work setting and jobs that would not be fast paced or as having strict production quotas, would there be work available. The VE responded that the same jobs would still be available, as the addresser, order-clerk, and office helper jobs are unskilled and they are not fast paced. (R.67). The VE further expounded, however, that if this individual were likely to be off task, due to symptoms associated with seizure disorder, for 25% of an eight-hour workday, there would be no employment options. *Id*. Mr. Musso's attorney then asked the VE what amount of time could an individual, as detailed above, be off task and still gainfully employed. The VE responded that individuals performing unskilled work are expected to always be on task outside of their normal breaks. *Id.*

III. Medical Record

In addition to the testimony of Mr. Musso, and the testimony of the VE, the record before the ALJ also included

medical records from his past filing as well as his recent medical history.

Issues relating to his head and body injuries include:

-May 2007 seizure at home, fell to the floor, striking his head. The next day he was stumbling and complaining of headaches. (R.587,851,853,905,907). CT of the head May 21, 2007. Impression was bilateral subfrontal hemorrhagic contusions and a non-displaced left suboccipital calvarial fracture extending into the left skull base (R.422-423). The hemorrhage was not advancing. CT performed the next day re-demonstrated the left occipital fracture, and stated the bifrontal hemorrhagic contusions were unchanged and no new hemorrhages were seen (R.424,856). May 23, 2007, he still had a severe headache. (R.605). Cervical CT revealed degenerative changes at C6-C7 (R. 421).

--June 30, 2007, Mr. Musso had a motor vehicle collision resulting in a left femoral neck fracture (R.430). Dr. Michael Sturgill stated he presented with a total loss of consciousness, and a cervical spine fracture, but was stabled and cleared for surgery. (R. 492). Cervical CT June 30, 2007 due to neck pain revealed an hemongioma in the anterior left lateral aspect of C7 with a cortical interruption highly suspicious of an acute fracture, and degenerative changes. (R.437,484).

--An X-ray June 30, 2007 due to leg pain post the motor vehicle accident revealed a mildly impacted, angulated left femoral neck fracture. (R.453,481). The fracture was comminuted at the neck. Internal fixation was performed, using three screws (R.461, 475).

--An EEG performed July 5, 2007 was interpreted as moderately abnormal because of intermittent bitemporal delta slow waves and sharp waves. Impression also stated the record was consistent with an interictal or postictal state (R.450,471).

--October 30, 2007, Dr. Franco Campanella of Neurological Associates wrote about his May 2007 assessment of Mr. Musso to Dr. Stevia. (R.990) Dr. Campanella opined that a perinatal injury may have been the etiology of his seizures. He noted that he presented to him after a fall from a seizure which resulted in a suboccipital fracture and bifrontal hemorraghic contusions. He also explained to Dr. Stevia that Mr. Musso is "very noncompliant with his medication." *Id.* He noted that Mr. Musso did not have surgery after the fall, yet seemed to be getting much better. His physical examination revealed him to be "awake, alert, and oriented times three"…except for the fact that he has been very noncompliant with his medication." *Id*. Finally, Dr. Campanella noted that Mr. Musso:

> openly admits that he keeps stopping his
> Keppra because he has difficulty affording it.
> I offered him several other options, however
> he knows that Keppra is going to go generic
> and would like to stay with it. I also offered

> him some samples and I made a pact with him
> that he will continue the medication for the
> time being. He feels as though he takes
> Dialntin 200 mgs twice a day and Keppra 500
> mgs twice a day that his seizures are at bay.

(R. 990)


--Dr. Suman Setia noted on May 29, 2008, that Mr. Musso had been

doing fine since his last hospitalization in May of 2007 (due to

a fall after a seizure) until last night when he was walking

down the street a block from his home, had tonic-clonic seizure

activity, fell, struck his head to the ground, and lost

consciousness. He was taken to the ER by EMS and was not able to

call his family until the following morning (R,615,915).

--X-ray revealed an acute right femoral neck fracture with

partial coxa vara deformity (R.807,859,860,894)

--CT of the head, performed May 28, 2008 without contrast due to

head injury and seizure revealed old left suboccipial skull

fracture and a right frontal scalp hematoma (R.811). Cervical CT

revealed reversal of the normal lordotic curve, evidence of old

interosseous disc herniation at C7, unchanged from prior exam,

but new changes of disc space narrowing at C5-6 and C6-7 with

generalized degenerative changes and mild facet joint

arthropathy (R.892,952).

--May 30, 2008, Dr. Steven Chandler performed percutaneous

pinning of the right hip for reduction of Garden-II fracture of

the right femoral neck. (R.638,839,924). Dr Setia described this as open reduction-internal fixation (R.914). Mr. Musso also saw Dr. Campanella of neurology on May 30, 2008. He noted that Mr. Musso presented with a tonic-clonic seizure and stated that he had not taken his Keppra for several days because he "ran out". (R.918). Dr. Campanella noted that Mr. Musso did this same thing four months ago and had the same tonic-clonic seizure. *Id.* He increased his Keppra to 750 mg b.i.d (R.618, 918).

--June 16, 2008, Mr. Musso reported tightness in his right thigh and groin which feels like a Charlie horse. He reported difficulty with sit to stand transitions and that it was uncomfortable to get moving after sitting for a while. He walked with a limp. He was referred to physical therapy and found fit for work with restrictions (R.902-904).

--He had two seizures on July 9, 2008. He had been drinking alcohol for 2 days and had not taken Keppra for 2-3 days. He felt tired (R.650,955). On September 9, 2009, Dr. Campanella noted that for the last seven months Mr. Musso has been complying with his medication and has not had any seizures. (R.986). However, he was involved in a motor-vehicle accident while he was a pedestrian. He flipped over a car and hurt his arm on the right side, had some bone chipping in his wrist, and discomfort in his shoulders but otherwise okay. (R.986,1342).

In a Function Report dated July 10, 2010, his father, Rosario Musso, stated he doesn't feel good and usually lies on the sofa, watching TV. He is agitated, anxious, and has trouble sleeping. He easily loses his temper. He needs reminders after his seizures. He cannot handle a savings or checking account, or money orders, because of concentration difficulties. He has difficulty understanding and following instructions. His brain has been through a lot and his focus is weak (R.289-294).

In a seizure description form dated July 10, 2010, his father explained he has had seizures, more than once per month, since age 8. He loses his balance and falls. He loses consciousness; they last 1-2 hours; he trembles, jerks his arms, and has head movements. When he wakes up he is restless and wants to move around (R.301).

In a Seizure description form dated July 10, 2010, his mother, Concetta Musso, stated she witnessed about 2-3 seizures per month since he was 8. His head moves from side to side and he falls. He hits his head. His whole body shakes and he bites his tongue. He has hurt his head, back, and hip when he falls (R.300). In a Seizure description of July 10, 2010, his friend, Maria, corroborated the above. She witnessed 3 seizures that year (R.299).

A letter dated September 14, 2011 from his brother, Gino Musso, and signed by his parents, states he has witnessed dozens

of seizures. He loses consciousness, falls and his body convulses violently. His breathing seems to stop and sometimes he foams at the mouth and loses control of bodily functions. Gino stated that on many occasions, he has "drifted off", sometimes slightly and sometimes severely. For example, when asked to change the TV channel, he has gone to the laundry room and turned the dial on the washer, and shortly thereafter he had a seizure. Other observations include rapid blinking, fatigue, forgetfulness, severe bouts of anger, loss of equilibrium, and mis-stepping (R.351).

IV. ALJ Decision

On October 26, 2011, the ALJ issued a fully unfavorable decision, finding that Mr. Musso was not disabled under section 1614(a)(3)(A) of the social security act. (R.23). The ALJ applied the five-step sequential analysis as required by the Act, under 20 C.F.R. 416.920(g).

The ALJ found that Mr. Musso's seizure disorder was a severe impairment to his past relevant work. (R.22). However, the ALJ found an insufficient amount of evidence in order to find Mr. Musso disabled. (R.22-23).

At step one, the ALJ determined that, although Mr. Musso worked after his alleged disability onset date, July 8, 2008, the level did not amount to substantial gainful activity. (R.14).

At step two, the ALJ determined that Mr. Musso's seizure disorder causes more than a minimal limitation to his ability to work, and, therefore, is a severe impairment. (R.15). The ALJ found his femur fracture to be a non-severe physical impairment, explaining that the record does not reflect any treatment for this condition during the relevant time period of March 13, 2010, onwards. Also, the State agency expert did not impose any limitations in the claimant's residual functional capacity assessment due to this condition. Id. The ALJ stated that she gave that opinion great weight as it was consistent with, and supported by, the objective evidence in this matter. She also noted that the claimant reported that he walks frequently, and she felt that tends to show that this condition does not cause any more than minimal physical limitations. Id.

Regarding Mr. Musso's medically determinable mental impairment of depression, the ALJ found that it does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is, therefore, non-severe. The ALJ noted that she looked to the claimant's admission at the hearing that he had not gotten any treatment for his alleged depression, which she noted tends to indicate that the claimant himself does not view it as a serious issue. *Id.* Furthermore, on September 7, 2010, Tyrone Hollerauer, Psy.D., completed a Psychiatric Review Technique form on the

claimant's case for the State agency.  Dr. Hollerauer stated
that the claimant did not have any severe mental impairments.
On December 20, 2010, Michael Schneider, Ph.D., affirmed Dr.
Hollerauer's opinion as written.  The ALJ stated that she
gave great weight to the opinions of Dr. Hollerauer and Dr.
Schneider as they were consistent with, and supported by, the
objective evidence in this matter. (R.15).  The ALJ further
noted that she considered the four broad functional areas set
out in the disability regulations for evaluating mental
disorders and in section 12.00C of the Listing of Impairments
(20 CFR, Part 404, Subpart P, Appendix 1). These four
functional areas are known as the "paragraph B" criteria- daily
living, social functioning, concentration/persistence/pace, and
episodes of decompensation.  The ALJ found that Mr. Musso has a
mild limitation in activities of daily living, mild limitation
in social functioning, mild difficulties maintaining
concentration, and no episodes of decompensation, which have
been of an extended duration. (R.15-17.)

     At step three, the ALJ determined that Mr. Musso's
impairments did not meet or equal any of the listed impairments
in the enumerated listings.  (R.17).

     At step four, the ALJ determined that Mr. Musso "has the
residual functional capacity to perform light work . . . except
that: the claimant should not stand/walk more than two to four

hours in an eight hour workday; the claimant is unable to climb ladders, ropes and scaffolds; the claimant can occasionally climb ramps and stairs; the claimant can occasionally balance, stoop, kneel, crouch, and crawl; the claimant must avoid all exposure to temperature extremes and to hazards, such as moving machinery or unprotected heights; the claimant must avoid driving motor vehicles; and the claimant is limited to unskilled work tasks that can be learned by demonstration or in 30 days or less." (R.17).

The ALJ supported this determination, by considering all Mr. Musso's symptoms, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p, as well as opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (R.18). The ALJ noted that Mr. Musso is alleging disability due to: "a seizure disorder, with alleged associated head trauma, concentration issues, and cognition issues; a broken femur, status-post pinning, with alleged associated pain when sitting or standing for long and with an alleged associated need to walk on occasion; and depression… The claimant alleges the following side effects from his medications: drowsiness; delirium/confusion; irritability; tremors; joint pain; and

muscle spasms/movement." (R.18). The ALJ then explained that, while Mr. Musso's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his subjective claims as to the intensity of the pain and impairments were not credible. (R.19).

The ALJ noted that, with regard to Mr. Musso's seizure disorder, she finds his allegations, as well as those of his family, that his impairment is work-preclusive to be far less than fully credible given that work-preclusive limitations due to this impairment are not supported by the objective evidence that shows that his seizures are well-controlled and infrequent when he is compliant with his medications. (R.20). She points to the record on June 4, 2010, where the claimant had a CT scan that was largely unremarkable, with no specific negative findings, after complaining of headaches. *Id.* On June 14, 2010, the claimant visited his treating source for refills on his seizure medications, and, importantly, the claimant had no seizure- related complaints. *Id.* The ALJ additionally underscores that the record reflects that Mr. Musso admitted that he had gone for at least six months without a seizure as of that visit (and the seizure six months earlier was reported to have been caused by medication non-compliance). *Id.* "On that day, the claimant's treating source stated that the claimant's seizure disorder was stable, and these treatment

records tend to show that the claimant's seizure disorder is well-controlled when the claimant is compliant with his medications." *Id*.

In terms of Mr. Musso's alleged depression, his broken femur's status post-pinning, and medication side-effects, the ALJ finds that there is evidence establishing some limitation, however, he is still capable of performing light exertional work on a sustained basis, with additional limitations. (R.19). The ALJ gave little to no weight to the "lay opinions" of the claimant's brother, mother, and father whom submitted letters and forms opining that they did not think Mr. Musso could work due to his seizures. (R.21). The ALJ found that their opinions were not consistent with, and not supported by, the objective evidence in this matter, showing that Mr. Musso's seizures are well-controlled when he maintains medication compliance. *Id*. Lastly, the ALJ noted that she imposed more limitations than that of the two doctors who completed a Residual Functional Capacity Assessment (RFC) on Mr. Musso's case for the State agency, "in order to give the claimant every possible benefit of the doubt." (R.21).

At step five, the ALJ determined that, considering the plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can

perform." (R.22). The VE listed the following positions:
office helper, DOT code 239.567-010, (300,000 nationally/30,000
Chicago); order clerk (sedentary exertional level and unskilled),
DOT code 209.567-014, (20,000 nationally/2,000 Chicago); and
addresser (sedentary exertional level and unskilled), DOT code
209.587-010, (12,000 nationally/ 1,200 Chicago). *Id*. After
listening to the testimony of a VE, the ALJ determined that Mr.
Musso would be "capable of making a successful adjustment to
other work that exists in significant numbers in the national
economy." (R.23). The ALJ concluded that "[a] finding of "not
disabled" is, therefore, appropriate…" Id.

Mr. Musso requested review by the Appeals Council but the
request was denied on January 22, 2013, leaving ALJ Supergan's
decision as the final decision of the Commissioner. (R. 1). On
March 15, 2013, Mr. Musso filed suit in this Court. The Court
has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c).
The parties consented to the jurisdiction of the Magistrate
Judge on June 25, 2013. [dkt. #16]. Mr. Musso filed his motion
for summary judgment [dkt. #21] on September 5, 2013, and the
Commissioner filed its response and cross motion for summary
judgment [dkt. #34] on January 17, 2014. Mr. Musso filed his
reply on January 31, 2014.

## Standard of Disability Adjudication

An individual claiming a need for Disability Insurance benefits and SSI must prove that he has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his/her past relevant work, and fifth; the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405 (g); *Steele v. Barnhart*, 920 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as

21

a reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct.
1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for
substantial evidence, the Court may not "displace the ALJ's
judgment by reconsidering facts or evidence or making
credibility determinations." *Skinner v. Astrue*, 478 F.3d 836,
841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212
(7th Cir. 2003)). Where conflicting evidence allows reasonable
minds to differ, the responsibility for determining whether a
claimant is disabled falls upon the Commissioner, not the
courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate
and logical bridge from the evidence to her conclusions, so that
the Court may afford the claimant meaningful review of the SSA's
ultimate findings. *Steele*, 290 F.3d at 941. It is not enough
that the record contains evidence to support the ALJ's decision;
if the ALJ does not rationally articulate the grounds for that
decision, or if the decision is insufficiently articulated, so
as to prevent meaningful review, the Court must remand. *Id.*

Discussion

Mr. Musso argues that the Commissioner's decision denying
benefits should be reversed or remanded because: (1) the ALJ
erred in not reviewing the prior medical record; (2) the ALJ
failed to discuss all his significant medical impairments; (3)

22

the ALJ erred by failing to consider evidence of cognitive
dysfunction; (4) the ALJ erred by failing to consider all
limitations supported by the record in the RFC and hypothetical;
and (5) the ALJ failed to properly determine credibility.  The
Court will analyze each claim in turn.

## A. The ALJ Erred in not Reviewing the Prior Medical Record

Mr. Musso first faults the ALJ for not reviewing the prior
medical records which pre-dated the ALJ decision of March 12,
2010, citing HALLEX 1-2-6-58 Conduct of Hearings - Admitting
Evidence into the Record at the Hearing.  Pl.'s Br. 4-8.  HALLEX
1-2-6-58 states the ALJ must obtain records of prior hearing and
add them to the current list of exhibits.  DI 81020.030 states
evidence from a previously processed case *may* have adjudicative
significance to the evaluation and determination of the current
case. Program Operations Manual System (POMS) DI 81020.030
(Prior Folder Material)(emphasis added).  Mr. Musso avers that
the ALJ did not review Exhibits 1E (R. 258) through 5E (R.283)
and 1F (R. 360) through 11 F. (R. 1000), and that the exhibits
are significant as they show that he had multiple head and leg
injuries from motor vehicle accidents and from falling and
striking his head as a result of seizures.  Mr. Musso opined
that the cumulative effect of those injuries was decreased
cognition, and that all the exhibits should have been considered
for that reason.

The Commissioner counters that the ALJ did comply with the requirements of HALLEX I-2-6-58(A), which require an ALJ to obtain the records of the prior hearing and add them to the current list of exhibits. The Commissioner avers that the ALJ included medical exhibits 1F to 12F, covering the prior adjudicated period (R. 360-1076). Additionally, the Commissioner argues that the ALJ included the hearing transcripts of the two administrative hearings on Plaintiff's prior claim (R. 71-122), therefore, all materials were properly included in the administrative record for Mr. Musso's current claim. Def.'s Br. 5-7.

Upon review of the entire double record before the Court, the Court finds that all of the information on Mr. Musso's prior claim is included therein. However, contrary to Plaintiff's suggestion, the administrative procedures do not require the ALJ to conduct an exhaustive reconsideration of all of the evidence in the prior claim. The ALJ was not required to discuss every piece of evidence contained in the prior or current administrative record. Instead, the ALJ is required only to articulate "at some minimum level, [her] analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Diaz v. Chater,* 55 F.3d 300, 307B08 (7th Cir. 1995). "The ALJ's failure to address [certain] specific findings . . . does not render his decision unsupported by substantial evidence

because an ALJ need not address every piece of evidence in his decision." *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002); *see also, e.g., Hodges v. Barnhart,* 399 F. Supp. 2d 845, 855 (N.D. Ill. 2005) (affirming decision where "ALJ summarized the substantial medical evidence provided by the claimant and considered the medical evidence in its entirety"). "[A]n ALJ need only 'minimally articulate' his or her justification for rejecting or accepting specific evidence of a disability." *Rice*, 384 F.3d at 371 (quoting *Stewart v. Bowen,* 858 F.2d 1295, 1299 (7th Cir. 1988)).

Here, the ALJ certainly met the standard. Not only did she include and take into consideration all of the evidence, stating that she would be using the prior information to inform her analysis of the current record and, accordingly, her decision, but also the Court can trace the path of the ALJ's reasoning regarding the evidence from the prior claim, as her functional capacity conclusions matched the medical expert's testimony (R. 17, 103-04).

The ALJ's conclusions regarding Mr. Musso's residual functional capacity, the primary issue in this claim, match the conclusions of Dr. Ezike, the medical expert who testified at the 2010 hearing on Plaintiff's prior claim (R. 17, compared with Rr. 104). The medical expert reviewed the evidence from the prior claim and testified that Plaintiff could lift twenty

pounds occasionally and ten pounds frequently; sit for about six hours in a workday; stand and walk for two to four hours in a workday; was unable to climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally balance, stoop, squat, bend, and crawl; and must avoid all exposure to temperature extremes and hazards such as moving machinery or unprotected heights (Rr. 103-04). Plaintiff has failed to show any restrictions that the ALJ left out based on the evidence from his prior claim.

Furthermore, although the ALJ explained that she was not reopening or disturbing the prior claim findings, properly finding that they were "denied conclusively on *res judicata* grounds prior to March 13, 2010 (R. 12)," does not mean that she did not evaluate the evidence and allow it to inform her decision, as she said she would. Accordingly, Plaintiff's argument that the ALJ failed to consider the impact of his prior injuries and impairments on his functional capacity are without merit.

B. The ALJ Failed to Discuss Significant Medical Impairments

Next, Mr. Musso argues that his case is more than a seizure case in that his claim also revolves around injuries incurred due to his seizures. He points to his medication list as evidence that he has other problems, as he takes medications for diabetes, asthma and bronchitis (R. 1169-1171). In July 22,

2010, he had a productive cough with yellow sputum for 2 months. He was treated with an albuterol nebulizer and diagnosed with bronchitis (R.1169-1171). He was prescribed albuterol, azithromycin, and arithromycin (R.1174). On August 6, 2010, he was diagnosed with acute (adult) asthma (R.1168). He uses an albuterol nebulizer, azithromycin and arithromycin (R. 1174). Mr Musso argues that the ALJ erred in not considering such issues as serious impairments, as the impairments and medications are to be considered in their totality (R. 1118-1121). Additionally, he argues that both ALJs failed to consider pain in his legs due to breaking both femurs and his neck.

The Commissioner contends that it is Mr. Musso's burden to prove that his impairments cause specific restrictions, and that he has failed to identify any medical source opinion that suggests any of his conditions had a greater impact on his functional capacity than the ALJ found, physically or mentally. Indeed, the Court finds that the ALJ assessed greater limits than the state agency physicians and psychologists (R. 17, compare with exhibits 14F, 15F, 18F, at Rr. 1083, 1244 (Dr. Hollerauer and Dr. Schneider - no severe mental impairment ), R. 1098 (Dr. Kim - no exertional limits established), R. 1099 (Dr. Kim - never climb ladders, ropes or scaffolds), and Rr. 1101, 1244 (Dr. Kim and Dr. Bitzer - avoid concentrated exposure to hazards such as machinery and heights).

The ALJ assessed light work restrictions with a variety of postural and environmental restrictions that concurred with medical expert's testimony from Plaintiff's earlier claim (compare R. 17 and 104). The ALJ explained in her decision that she recognized her restrictions were greater than some of those assessed by the state agency reviewing medical sources, but reasoned her greater restrictions were assessed in order to give Plaintiff's symptom allegations "every possible benefit of the doubt" (R. 21). She accommodated Mr. Musso's seizure disorder with limits against climbing ladders, ropes and scaffolds; avoiding temperature extremes and hazards such as moving machinery or unprotected heights; and avoiding driving motor vehicles (R. 21). The ALJ stated that she accommodated his history of femur fracture and associated symptoms of pain with a limit for light work that did not require standing or walking for more than two to four hours; occasionally climbing ramps and stairs; and occasionally balancing, stooping, kneeling, crouching, and crawling (R. 21). In order to accommodate Plaintiff's symptoms related to depression, cognition, concentration, and side effects to medication, she limited Mr. Musso to unskilled tasks that could be learned by demonstration or in thirty days or less (R. 21).

All of the above considerations for Mr. Musso's restrictions allow the Court to reasonably trace the path of the ALJ's reasoning regarding her functional capacity findings. Although Mr. Musso asserts that he has disabling restrictions due to his physical conditions, he does not identify any specific functional capacity restrictions that the ALJ left out that would be related to his physical impairments. As Defendant highlighted, Mr. Musso does have the burden of proving that his impairments caused specific restrictions. *See Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987). Mr. Musso does not direct the Court to any medical sources that assessed greater restrictions than the ALJ, and the Court was unsuccessful at locating any sources as well. Mr. Musso has not shown that any of his doctors stated that he was disabled, or that his capacity should be restricted beyond a reduced range of light work. The ALJ adequately addressed the evidence of Plaintiff's conditions, and her decision reasonably reflects the path of her reasoning. *See Johansen v. Barnhart,* 314 F.3d 283, 287 (7th Cir. 2002); *Diaz v. Chater,* 55 F.3d 300, 307-08 (7th Cir. 1995). Mr. Musso's disagreement with the significance that the ALJ assigned to the evidence she cited does not mean that substantial evidence does not support her decision. *See Denton v. Astrue,* 596 F.3d 419, 426 (7th Cir. 2010); *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002). Accordingly, the Court finds that the ALJ provided

substantial evidence to reach her conclusion on Mr. Musso's
significant limitations.

C. The ALJ Failed to Consider Evidence of Cognitive Dysfunction

Mr. Musso alleges that the ALJ erred in failing to list a
cognitive impairment as one of his severe impairments, and
argues that the ALJ should have included additional functional
capacity limits based on this impairment.  Mr. Musso argues that
old exhibits had evidence of head trauma, while in the new
record, reviewed on June 1, 2010, Dr. Richardson stated Mr.
Musso's last seizure was 5 months ago (R. 1070).  Nonetheless,
the ALJ found at step two that Mr. Musso's seizure disorder was
a severe impairment (R. 15-17).  The ALJ also acknowledged that
Plaintiff had a diagnosis of depression, but explained that
Plaintiff had no treatment for this condition (R. 15). She
referred to medical evidence from Dr. Karr's consultative
psychological examination and the conclusions of two state
agency psychologists, Dr. Hollerauer and Dr. Schneider, who
reviewed those examination findings and made conclusions about
the impact of Plaintiff's mental condition on his functional
capacity (R. 15-17, referring to exhibits 13F, 14F, 18F at R.
1077-96, 1242-44).  The ALJ concluded that Mr. Musso's mental
condition did not cause more than minimal limitations of his
ability to perform basic mental activities (R. 15). The ALJ also
assessed a restriction for unskilled work to accommodate

Plaintiff's symptom allegations of depression, cognition issues, concentration issues, and medication side effects, to the extent she found those allegations partially credible (R. 16, 21).

The Court agrees with Mr. Musso, the ALJ did not refer to a specific diagnosis of cognitive dysfunction in her discussion of Plaintiff's mental condition. However, she assessed Mr. Musso's mental functioning and considered evidence of Plaintiff's mental condition, as well as its impact on his functional capacity. Specifically, the ALJ analyzed Plaintiff's mental condition, and discussed his ability to function in the four "B criteria" functional areas of activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation (R. 15-16). The ALJ described specific evidence from the psychologists in the record and cited statements from Mr. Musso and his father about his ability to engage in activities pertaining to each of these criteria (R. 15-17, referring to exhibits 7E, 13E, 13F, 14F, 18F at Tr. 285-96, 326-38, 1077-96, 1242-44).

In her discussion of Mr. Musso's mental condition, the ALJ found he had no more than mild limits in any of the four "B criteria" areas of functioning that she assessed (R. 15-17). Importantly, Mr. Musso does not suggest any specific limits on his mental functioning related to cognitive dysfunction. Pl. Br. 8-11, 13-17. Moreover, Mr. Musso does not identify any

physicians or psychologists who diagnosed a cognitive impairment, assessed any limits on his mental functioning, or found more than mild limits in any areas of mental functioning. Pl. Br. 8-11, 13-17.

For example, Mr. Musso sets out that on August 17, 2010, the examining psychologist, Dr. Jeffrey Karr, Ph.D., performed a psychological evaluation for the State Agency which lasted 50 minutes. Mr. Musso underscored how Dr. Karr noted that he alleged head and leg pain following a car accident; he quit work due to health problems in 2008; his first seizure was in 4th grade; and he has sadness identifying, "I can't live as normally or as fully as others". Dr. Karr noted Mr. Musso was noticeably underweight and his mood was dysphoric. He felt Mr.Musso seemed discouraged, solemn, subdued, soft-spoken and that he required frequent repeated instructions, and responded slowly. (R.1082). Although Mr. Musso directs the Court to Dr. Karr's notation of all of the above, it is in vain as Dr. Karr clearly recognized Mr. Musso's depressive disorder, yet still chose not to diagnose him with cognitive dysfunction, nor did he recommend any specific limitations on his mental functioning (R. 1079-82). Likewise, the state agency psychologist, Dr. Hollerauer, who reviewed the record evidence, including Dr. Karr's examination report (R. 1095), concluded that Mr. Musso had no severe mental impairments (R. 1083), and no more than mild restrictions in any

area of mental functioning (R. 1093). Dr. Schneider, another state agency psychologist, reviewed Mr. Musso's updated medical records and concurred with Dr. Hollerauer's earlier findings, as well (R. 1244).

Mr. Musso avers that a reasonable mind would conclude that his seizures have caused trauma to his entire body, especially his head and his hips, that he had hurt himself substantially and that the record supports head and hip trauma. The Court finds that the ALJ did reasonably conclude that his seizures had caused trauma to his entire body, especially his head, that she took the injuries into consideration, and that she supported her decision with substantial evidence.

D. The ALJ Failed to Consider all Limitations

Next, Mr. Musso argues that, although the RFC limited him to unskilled work tasks that can be learned by demonstration or in 30 days or less, such a restriction does not account for his mental limitations. Mr. Musso relies on *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009), and states that when determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered severe, and that a restriction to unskilled work is not a substitute for appropriate mental limitations. Additionally, he argues that limiting the RFC to simple, routine tasks that do not require constant interaction with co-workers

or the general public does not account for moderate limitations on concentration, persistence and pace (*O'Connor-Spinner v. Astrue*, 627 F. 3d 614, 618 (7th Cir. 2010)).

Defendant contends that the ALJ was more that generous in her assessment, and distinguishes Plaintiff's case law based on Mr. Musso's mild restriction. Defendant explains that in both *Stewart* and *O'Connor-Spinner*:

> the ALJ found the claimant had at least moderate restrictions in concentration, persistence, or pace. Here, in contrast, the ALJ found Plaintiff had only a mild restriction in concentration, persistence, or pace (Tr. 16), as supported by the state agency psychologist (Tr. 1093). Thus, the ALJ could have assessed no limit at all on Plaintiff's mental functioning, given that his mental impairment was not severe (Tr. 1083, Dr. Hollerauer - mental impairments not severe; Tr. 1093, Dr. Hollerauer - mild limitations in concentration, persistence or pace; Tr. 1244, Dr. Schneider - non-severe psychiatric review technique form and unlimited mental residual functional capacity). Instead, the ALJ gave Plaintiff "every benefit of the doubt" and assessed an unskilled work limit to accommodate some of Plaintiff's allegations of concentration symptoms, even though they were poorly supported by the record (Tr. 21).

Def.'s Br. 12

The Court finds that, contrary to Plaintiff's argument, the ALJ was indeed generous when she assessed the unskilled work restriction, as none of the physicians who treated or examined Mr. Musso, or reviewed his records, assessed such a restriction. Likewise, Mr. Musso has not shown limits on decision making,

changes in work setting or pace or production quotas were
warranted.  Pl. Br. 17.  Dr. Karr did not find that Plaintiff
had reduced memory, thought disorders, judgment problems, or
communication problems (R. 1079-82).  As discussed earlier, the
examining psychologist, and the state agency psychologist who
reviewed Dr. Karr's findings, found that Plaintiff had an intact
memory for dates, news events, and digit recall (R. 1080-81,
1095), no thought disorders (R. 1080), and organized, coherent
speech (R. 1080, 1095).  He demonstrated intact judgment when
answering questions about mailing an envelope found on the
ground and reporting a fire in a movie theater (R. 1081, 1095).
He was not distracted or preoccupied during testing (R. 1080),
and concentrated well enough to complete mathematic calculations
(R. 1081).  Moreover, as the reviewing physician noted, the
notation from Dr. Karr regarding a need for repeated
instructions and slow response (Rr. 1080), was not corroborated
by other neurological examination findings in June 2010 (R.
1095).  Thus, the ALJ reasonably relied on this evidence in
finding no restrictions beyond unskilled work, and the Court
finds that the ALJ provided substantial evidence to reach her
conclusion.

E. The ALJ Failed to Properly Determine Credibility

        Lastly, Mr. Musso contends that the ALJ did a very minimal
credibility analysis, mainly relying on his RFC analysis.  He

argues that before an ALJ can use lack of treatment, the ALJ must question the individual for his explanation. *Jelinex v. Astrue*, 662 F.3d 805 (7th Cir. 2012). Mr. Musso asserts that the ALJ did not explore any reasons explaining why he did not always take his medication, forgot to take his medication, or ran out of medication, and that SSR 96-7P requires the ALJ to consider any information in the case record that may explain a failure to follow a regular course of treatment, such as Mr. Musso's explanation that he does not always take Keppra because it is not generic and he cannot afford it (R. 990).

The Commissioner argues that, contrary to Plaintiff's suggestion, the ALJ considered a variety of appropriate factors when assessing Plaintiff's credibility, including corroboration by objective medical findings, consistency of allegations with Plaintiff's stated activities, use of medication and other forms of treatment to relieve symptoms, medication side effects, and physician opinions assessing the impact of his symptoms on his functioning (R. 15-21). *See* 20 C.F.R. § 404.1529(c)(2) (objective medical evidence is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms); *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000) ("The discrepancy between the [symptoms] attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her

condition.") Defendant points to the ALJ's consideration of Plaintiff's complaints of disabling symptoms due to femur fractures, but noted that the state agency physician imposed no restrictions based on this condition (R. 15, referring to exhibit 15F at Tr. 1097-104).

The ALJ provided evidence of her consideration of Mr. Musso's normal mental evaluation findings when considering his various mental symptoms (R. 15-17, referring to exhibits 13F, 14F and 18F at R. 1079-96, 1242-44). The ALJ also considered that Plaintiff's seizures were well-controlled with medication, only occurring when Plaintiff failed to take his medications or drank alcohol (R. 20-21, see e.g., Plaintiff's testimony at R. 55-56). Additionally, the ALJ considered that Plaintiff reported no medication side effects to his physicians (R. 19). The ALJ also considered that Plaintiff took no medication or treatment for any mental conditions (R. 15, see Tr. 1095, Dr. Hollerauer - "no mental source treatment or hospitalizations related to a mental impairment"). 20 C.F.R. § 404.1529(c)(3)(iv) (we consider the type, dosage, effectiveness and side effects of any medication you take to alleviate your symptoms).

Moreover, the ALJ considered various activities that Plaintiff engaged in that contradicted his claims of limitations due to his symptoms. See 20 C.F.R. § 404.1529(c)(3)(i) (we consider your daily activities). For example, Mr. Musso

37

complained of leg pain due to a history of fractures, but also
described activities that included walking frequently and taking
public transportation by himself, and riding a bicycle (R. 15
and 19, referring to exhibit 13F at R. 1079, 1081 and 13E at R.
333; R. 19, referring to evidence in exhibit 7E at R. 292).
The ALJ also relied on other daily activities, such as using a
computer, shopping in stores, and handling money as examples
that showed Plaintiff's concentration and cognition symptoms
were not as bad as he claimed (R. 16, referring to exhibit 13F
at R. 1079 and 13E at R. 333-34).

Plaintiff attempts to discount the ALJ's reliance on Mr.
Musso's own statements, including that he could handle a
checking and savings account and money orders, as unreasonable
due to him being a person with cognitive deficits, and that his
family members reported otherwise.  The Court finds this
argument unavailing, as Plaintiff, again, has failed to meet the
burden of proving he has cognitive deficits to the degree that
would cause him to relay such information inaccurately.

Instead, the Court finds that the ALJ reasonably considered
all of the factors above when evaluating the impact of Mr.
Musso's alleged symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(v).
The specific examples of medical findings and treatment evidence
given by the ALJ help trace the path of the ALJ's reasoning and
build a logical bridge from the evidence to her conclusion. *See*

*Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "An ALJ is in the best position to determine a witness's truthfulness and forthrightness." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). An ALJ's credibility finding is entitled to substantial deference and will be upheld "as long as [there is] some support in the record" and it is not "patently wrong." *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). "It is only when the ALJ's determination lacks any explanation or support that [a court] will declare it to be "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413 14 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). Here, the Court finds that the ALJ adequately explained her credibility analysis, and the Court will defer to the ALJ's conclusions.

## Conclusion

For the reasons set forth above, the Court denies Mr. Musso's motion [21] for summary judgment and grants the Commissioner's motion [34] for summary judgment, affirming the decision.


Date: May 22, 2014

E N T E R E D:

UNITED STATES DISTRICT COURT